UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

ROBERT STONEMAN,

CIVIL NO. 06-2366 (JRT/AJB)

PLAINTIFF,

REPORT AND RECOMMENDATION
ON PARTIES' CROSS MOTIONS
FOR SUMMARY JUDGMENT

V.

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,

DEFENDANT.

Lionel H. Peabody, Esq., on behalf of plaintiff, Robert Stoneman.

Lonnie F. Bryan, Esq., Assistant United States Attorney, on behalf of defendant, Michael J. Astrue, Commissioner of Social Security.

I.    INTRODUCTION

Plaintiff Robert Stoneman ("Plaintiff") appeals the unfavorable decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for disability insurance benefits ("DIB"). This matter is before the Court, United States Magistrate Judge Arthur J. Boylan, for a report and recommendation to the district court on the parties cross-motions for summary judgment. See 28 U.S.C. § 636(b)(1) and Local Rule 72.1. Based on the reasoning set forth below, this Court **recommends** that Plaintiff's Motion for Summary Judgment [Docket No. 6] be **granted** and that the Commissioner's Motion for Summary Judgment [Docket No. 10] be **denied**.

## II.    PROCEDURAL HISTORY

Plaintiff protectively filed his claim for DIB, under Title II of the Social Security Act, on August 7, 2003, alleging that he became disabled on August 30, 2002.  (Tr. 67-69).  His claims were denied initially and upon reconsideration.  (Tr. 25-30).  Plaintiff requested and was granted a hearing before an administrative law judge.  (Tr. 23-24).  A hearing was held on April 21, 2005, before ALJ Leonard A. Nelson.  (Tr. 379-420).  Plaintiff appeared at the hearing represented by Christine Edberg.  (Tr. 381). Dr. James P. Felling testified as a neutral medical expert and William Villa testified as a neutral vocational expert.  (Tr. 411-20).  On October 17, 2005, ALJ Nelson issued his factual findings and decision denying the claim for DIB.  (Tr. 22).  Plaintiff filed a request for review, and on April 20, 2006, the Social Security Appeals Council denied his request.  (Tr. 6-8, 11).  The decision of the ALJ thus became the final decision of the Commissioner.  On June 12, 2006, Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g).

## III.    FACTUAL BACKGROUND AND MEDICAL HISTORY

Plaintiff indicated that he was a Hospital Corpsman in the U.S. Navy from 1983 to 1988.  (Tr. 89).  Plaintiff subsequently worked as a licensed vocational nurse, licensed practical nurse, roofer, motor vehicle operator, mine safety inspector, and carpenter.  (Tr. 89).

In January of 2001, Plaintiff was seen at the Twin Ports VA Clinic after he injured his back in a fall on cement steps.  (Tr. 251).  An x-ray of his lumbar spine revealed an irregular cortical defect with some adjacent sclerosis along the L3 vertebral end plate and a mildly narrowed L2-3 through L4-5 interspace with associated hypertrophic change.  (Tr. 254).

In May of 2001, Plaintiff was reinstated for mental health treatment, having last been seen in

2

February of 1999.  (Tr. 249).  It was noted that he had experienced a recent manic episode and that he

had been experiencing suicidal thoughts without reaching the planning stage.  (Tr. 249).  Plaintiff agreed

to restart on Depakote.[1]  (Tr. 249).  Plaintiff was assessed with a Global Assessment of Functioning

score of 55.[2]  (Tr. 249).  On May 31, 2001, Plaintiff reported that he was tolerating the medication

well and that he wanted to be seen again in six months.  (Tr. 248).  On December 13, 2001, it was

noted that Plaintiff had gone off his Depakote for three weeks.  (Tr. 246).  Plaintiff reported feeling

"accelerated" while off the medication.  (Tr. 246).  Plaintiff's treatment note indicated a diagnosis of

bipolar disorder.  (Tr. 246).

On August 22, 2002, Plaintiff presented Twin Ports VA Clinic with the chief complaint of pain

in his left posterior thigh.  (Tr. 241).  It was noted that he had a history of intermittent radiculopathy.[3]

(Tr. 241).  It was noted that Plaintiff was working construction at the time, and that his pain was

exacerbated by standing or lifting.  (Tr. 241).  Plaintiff was given a prescription for Hydrocodone.[4]  (Tr.

---

[1] Depakote is used in the treatment of patients with complex partial seizures.  PHYSICIAN'S DESK REFERENCE 429 (60th ed. 2004).

[2] The Global Assessment of Functioning scale is used to assess an individual's overall level of functioning.  Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003) (citing the Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000)(hereinafter "DSM-IV")).  The lower the score, the more serious the individual's symptoms.  See id.  A GAF score between 51 and 60 indicates "[s]ome moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV 34.

[3] Radiculopathy is defined as "a disorder of the spinal nerve roots."  STEDMAN'S MEDICAL DICTIONARY 1503 (27th ed. 2000).

[4] Hydrocodone is, a semisynthetic narcotic analgesic prescribed "for the relief of moderate to moderately severe pain," with actions qualitatively similar to codeine.  PHYSICIAN'S DESK REFERENCE 3315.

241-42).

On December 11, 2002, Plaintiff was seen by Dr. Joseph F. Spencer ("Dr. Spencer") for complaints of chronic back pain. (Tr. 242). Plaintiff reported that he been feeling "down." (Tr. 241). Plaintiff indicated that his sister was ill and that he had been taking care of her. (Tr. 241). Plaintiff stated that he would prefer not to take anti-depressants, noting that Zoloft[5] had made him tired and he had an episode of priapism.[6] (Tr. 241).

On April 2, 2003, Plaintiff was again seen by Dr. Spencer, who noted that Plaintiff had tolerated the Depakote. (Tr. 234). Dr. Spencer noted that Plaintiff's sister had passed away three weeks prior and that Plaintiff felt guilty about her death. (Tr. 234). Dr. Spencer noted that Plaintiff had gone "on a bender for 3 days" but was able to stop and was scheduled to attend a center for drug and alcohol abuse in the near future. (Tr. 234). Plaintiff reported that he was doing well from a mood stabilization aspect. (Tr. 234). Dr. Spencer diagnosed Plaintiff with bipolar disorder, depressed type. (Tr. 234).

On May 21, 2003, Plaintiff was admitted to the Center for Alcohol and Drug Treatment. (Tr. 357). On admission he was assessed with a GAF score of 70.[7] (Tr. 357). Plaintiff reported that he

---

[5] Zoloft is used in the treatment of major depressive disorder, obsessive compulsive disorder, panic disorder, posttraumatic stress disorder, and social anxiety disorder. PHYSICIAN'S DESK REFERENCE 2582-83.

[6] Priapism is defined as a "persistent abnormal erection of the penis, usually without sexual desire, and accompanied by pain and tenderness." STEDMAN'S MEDICAL DICTIONARY 1456.

[7] A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV 34.

had recently relapsed after years of sobriety and that he had experienced intoxication and increased

thoughts of suicide.  (Tr. 357).  Plaintiff also reported using marijuana "one to two 'one-hitters' three

times a week."  (Tr. 357).  Plaintiff was characterized as entering treatment with a high potential for

continued use/relapse due to his history of marijuana and alcohol use particularly during high stress

situations.  (Tr. 358).  Plaintiff requested outpatient treatment following a residential treatment plan.

(Tr. 358).  Plaintiff was discharged from the program on September 29, 2003.  (Tr. 357).

On July 10, 2003, Plaintiff was seen by Dr. Deborah Ann King ("Dr. King") at the Duluth

Clinic Urgent Care, complaining of back pain.  (Tr. 165).  Dr. King noted that Plaintiff had a history of

back injury and degenerative disk disease as documented by MRI.  (Tr. 165).  Plaintiff describe pain

across his back radiating bilaterally into his buttocks and his posterior thighs to about knee level.  (Tr.

165).  Dr. King noted obvious intermittent discomfort while getting up and down from a sitting position

and with straight leg raises.  (Tr. 165-66).  Dr. King assessed Plaintiff with back pain with radicular

symptoms and prescribed him Flexeril and Ultram.[8]  (Tr. 166).

On July 28, 2003, Plaintiff was evaluated by Dr. Edward E. Martinson ("Dr. Martinson") for

his complaints of low back pain.  (Tr. 157-64).  Plaintiff reported a progressive decline in his functional

status and tolerance and constant pain, as a dull ache in his lower back.  (Tr. 157-58).  Plaintiff

indicated that the pain extended down the posterior aspect of his lower extremities into his feet, with

---

[8] Flexeril is prescribed "for relief of muscle spasm associated with acute, painful musculoskeletal conditions."  PHYSICIAN'S DESK REFERENCE 1833.  Ultram is the brand name for tramadol hydrochloride, a synthetic opioid analgesic prescribed "for the management of moderate to moderately severe pain in adults."  Id. at 2462-63.  Ultram's effects are similar to those of other opioids.  Id. at 2463.

more prominent symptoms on the left side. (Tr. 158). Following examination, Dr. Martinson assessed

Plaintiff with low back and bilateral lower extremity pain subsequent to a work-related injury in 1995,

exacerbated by the fall in January of 2001. (Tr. 160). Dr. Martinson noted multi-level lumbar

spondylosis with mild dessication/disk space narrowing at the L2-3 level, broad-based L4-5 disk

prolapse, defacing the anterior aspect of the thecal sac with moderate facet degenerative changes and

spinal stenosis at the L5-S1 level. (Tr. 160). Dr. Martinson ordered an MRI to compare with

Plaintiff's previous MRI as well as electrodiagnostic testing. (Tr. 161). Dr. Martinson encouraged

Plaintiff to discontinue tobacco use and discussed the potential benefits of further weight reduction. (Tr.

162).

That same day, Plaintiff underwent an MRI of his lumbar spine. (Tr. 167). The MRI indicated:

(1) negative findings at T12-L1; (2) minimal disc dehydration without evidence of significant spinal

stenosis or focal disc prolapse at L1-2; (3) disc dehydration and disc space narrowing without

evidence of focal disc prolapse or spinal stenosis at L2-3 and L3-4; (4) disc space narrowing with a

small area of focal disc prolapse centrally without evidence of significant nerve root deviation along with

degenerative facet change and ligamentum flavum hypertrophy causing minimal spinal canal narrowing

but no significant stenosis at L4-5; and (5) a small area of central disc prolapse without nerve root

impingement, fairly prominent disc dehydration and mild degenerative facet changes at L5-S1. (Tr.

167). Dr. Martinson reviewed the results of the MRI and noted that Plaintiff would continue to be

evaluated for surgical intervention. (Tr. 156).

Plaintiff completed an activities of daily living questionnaire in August of 2003. (Tr. 106-112).

Plaintiff indicated that he was unable to carry anything over 10 pounds without irritating his back, and

that he was unable to do any activities which required him to lift, bend, or twist.  (Tr. 106, 111).

Plaintiff indicated that that he was "a lot more cranky and argumentative."  (Tr. 109).  Plaintiff wrote

that he needed reminders to clean his house, groom and bathe, and to pay bills and handle finances.

(Tr. 110).  Plaintiff indicated that he had difficulty concentrating and reading.  (Tr. 110-11).

On August 8, 2003, Plaintiff was interviewed at a disability field office.  (Tr. 97-99).  The field

examiner noted that Plaintiff appeared to be in a lot of pain when he came into the office and that he

"limped quite a bit and seemed as tho[ugh] he was having extreme back pain[.]"  (Tr. 98).

Nonetheless, the examiner noted that Plaintiff did not seem to have any difficulty sitting through the one

hour interview.  (Tr. 98).  Plaintiff again exhibited difficulty upon getting up and leaving the office.  (Tr.

98).

On September 30, 2003, Plaintiff was evaluated by Marcus P. Desmonde, Psy.D., L.P. ("Dr.

Desmonde"), on referral from the state disability examiner.  (Tr. 177).  Plaintiff indicated that his

primary complaint was his back injury stating, "'My back is killing me.'"  (Tr. 177).  Plaintiff

characterized his pain as 9 on a scale of 10.  (Tr. 179).  Plaintiff stated that he was last able to work in

September of 2002, and that he could no longer work because his back hurt too much.  (Tr. 178).

Plaintiff stated that he had not had any inpatient psychiatric treatment, but that he had seen psychiatrists

at the VA for the previous three or four years.  (Tr. 177).  Dr. Desmonde observed that Plaintiff was

casually dressed with "compromised hygiene" and that he appeared nervous, agitated, and frustrated.

(Tr. 178).  Plaintiff reported problems with his concentration and memory, and stretches where he

would go without sleep for two or three days.  (Tr. 178).

On examination, Dr. Desmonde noted that Plaintiff was in good contact with reality and

7

oriented to time, place, person, and the purpose of the evaluation.  (Tr. 178).  Plaintiff was able to

recall 7 digits forward and 5 digits in reverse, a result which Dr. Desmonde characterized as average.

(Tr. 178).  Plaintiff was able to compute serial 7 additions and subtractions from 100 quickly and

accurately to 135 and 65 respectively, and he was able to recall 2 of 3 unrelated objects immediately,

after 5 minutes and after 30 minutes.  (Tr. 178).  Dr. Desmonde noted that Plaintiff was able to summon

"vivid recollections" of a number of jobs that he had held.  (Tr. 178-79).  Plaintiff demonstrated

abstractive capacity and Dr. Desmonde remarked that his judgment and insight did not appear to be

impaired.  (Tr. 179).

   Dr. Desmonde diagnosed Plaintiff with nicotine dependence, episodic alcohol abuse, bipolar

disorder, adjustment disorder with mixed anxiety, and depressed mood.  (Tr. 179).  Dr. Desmonde

assigned Plaintiff a GAF score of 45-50[9] for the previous 6 months.  (Tr. 179).  Dr. Desmonde

remarked that Plaintiff appeared to be capable of understanding simple to complex instructions, but that

he may have difficulty carrying out tasks with reasonable persistence and pace primarily due to chronic

pain.  (Tr. 179).  Dr. Desmonde further opined that Plaintiff would be capable of interacting

appropriately with supervisors, co-workers, and the general public, but that he would not be able to

tolerate the stress and pressure of full time, competitive employment.  (Tr. 179).  Dr. Desmonde noted

that Plaintiff's employability might be mitigated were he able to participate in a pain management

program.  (Tr. 179).

---

   [9] A GAF score between 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe
obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school
functioning (e.g., no friends, unable to keep a job)[.]"  DSM-IV 34.

In October of 2003, Plaintiff's medical records were reviewed by state agency psychologists who noted that Plaintiff had a history of bipolar disorder under fair control. (Tr. 211). The state agency psychologists indicated that Plaintiff had moderate limitations with detailed instructions, performing within a regular work routine, working in proximity to others, completing a normal workday/workweek, and interacting with the general public. (Tr. 186-87). They concluded that Plaintiff: would be able to concentrate on, understand, and remember routine, repetitive multiple step tasks and limited detailed instructions; complete routine, 3-4 step tasks; and had restricted but adequate ability to deal with the stress and pressure of routine, repetitive, 3-4 step tasks that involved a limited detail work setting. (Tr. 188). The psychologists concluded that Plaintiff had moderate limitations in daily activities, social functioning, and maintaining concentration, persistence, or pace, and had no episodes of deterioration or decompensation. (Tr. 209).

On October 7, 2003, Plaintiff contacted the Twin Ports VA Clinic, stating that he wanted to see Dr. Spencer sooner than three months because he was having trouble sleeping. (Tr. 223). On October 29, 2003, Plaintiff was seen by Dr. Spencer who prescribed a trial of Zolpidem.[10] (Tr. 222). On December 4, 2003, Plaintiff requested to be seen on a two month basis because he was "continuing to space out and have dreams." (Tr. 220).

On December 9, 2003, Dr. Spencer completed a form assessment of Plaintiff's mental ability to do work-related activities. (Tr. 180-81). Dr. Spencer marked Plaintiff's capacity as "good"[11] in the

---

[10] Zolpidem, known more commonly by the brand name Ambien, is a non-benzodiazepine hypnotic which is used in the short-term treatment of insomnia. PHYSICIAN'S DESK REFERENCE 2867-2868.

[11] The form defined "good" as the "[a]bility to function is limited but satisfactory." (Tr. 180).

9

following abilities: (1) remember work-like procedures; (2) understand and remember very short and

simple instructions; (3) carry out very short and simple instructions; (4)

maintain attention for two hour segment; (5) understand and remember detailed instructions; (6) sustain

an ordinary routine without special supervision; (7) make simple work-related decisions; (8) ask simple

questions or request assistance; and (9) accept instructions and respond appropriately to criticism from

supervisors.  (Tr. 180).  Dr. Spencer marked Plaintiff's capacity as "fair"[12] in the following abilities: (1)

set realistic goals or make plans independently of others; (2) maintain regular attendance and be

punctual within customary, usually strict tolerances; (3) work in coordination with or proximity to others

without being unduly distracted; (4) complete a normal workday and workweek without interruptions

from psychologically based symptoms; (5) perform at a competitive rate; (6) interact appropriately with

the general public; (7) behave in an emotionally stable manner; (8) adhere to basic standards of

neatness and cleanliness; (9) travel in unfamiliar place; (10) get along with co-workers or peers without

unduly distracting them or exhibiting behavioral extremes; (11) respond appropriately to changes in a

routine work setting; (12) deal with normal work stress; and (13) be aware of normal hazards and take

appropriate precautions.  (Tr. 180-81).  None of Plaintiff's abilities were marked in the capacity of

"poor or none" or "unlimited or very good."[13]  (Tr. 180-81).  Dr. Spencer also indicated that he

anticipated Plaintiff to be absent from work more than three times per month.  (Tr. 181).

On December 24, 2003, Plaintiff was seen by Daniel Wallerstein, DO ("Dr. Wallerstein")

---

[12] The form defined "fair" as the "[a]bility to function is seriously limited, but not precluded." (Tr. 180).

[13] Dr. Spencer did not check any capacity related to Plaintiff's ability to carry out detailed instructions.  (Tr. 180).

regarding his low back pain.  (Tr. 183-85).  Dr. Wallerstein noted that Dr. Martinson indicated there

was nothing more to be done for Plaintiff's back since surgery was not a good option.  (Tr. 183).  Dr.

Wallerstein also noted that Plaintiff had applied for treatment in the Chronic Pain Program at Miller-

Dwan Hospital.  (Tr. 183).  Plaintiff stated that he felt his symptoms had worsened over the previous

several months and made several references to his "'disintegrating spine.'"  (Tr. 183).  When asked

about his ongoing back program, Plaintiff describe stretches which he did once per week, but was

vague about any specific trunk related conditioning indicating instead "that his back is plenty strong by

doing activities around the house."  (Tr. 183).  Dr. Wallerstein noted that Plaintiff's symptoms appeared

to improved with pain medications.  (Tr. 183).  Plaintiff reported that his sleep was intermittently

affected, and stated that he felt depressed and has a lot of feelings of uncertainty.  (Tr. 183).

On exam, Dr. Wallerstein observed that Plaintiff appeared emotional and frustrated,

demonstrating a "fair amount of self-pity."  (Tr. 184).  Plaintiff indicated that he felt he had not been

given enough direction.  (Tr. 184).  Dr. Wallerstein assessed Plaintiff with a chronic pain condition,

limited degenerative changes of the lumber spine including mild degenerative disk changes, morbid

obesity, and depression/anger involving long term frustration.  (Tr. 184).  Dr. Wallerstein expressed

concerns that Plaintiff had probable limited problem solving skills and/or a limited willingness to do

more to help himself.  (Tr. 184).  Dr. Wallerstein suggested a 50 pound lifting limitation and encouraged

Plaintiff to re-establish his exercise program.  (Tr. 185).

On January 22, 2004, Plaintiff underwent an evaluation for post traumatic stress disorder

related to his experience as an ICU corpsman while in the military.  (Tr. 360).  Kerri J. Lamberty,

Ph.D, L.P. ("Dr. Lamberty") noted that Plaintiff developed psychiatric problems during a second

11

expeditionary tour with the U.S. Marines.  (Tr. 362).  Dr. Lamberty also noted that during his years of service and after, Plaintiff had difficulty maintaining friendships.  (Tr. 362).

Dr. Lamberty noted that Plaintiff had a tendency to be irritable and angry.  (Tr. 363).  Plaintiff stated he had no plan for the future, but denied being suicidal.  (Tr. 363).  Plaintiff stated that he sometimes needed to return home to check that electrical equipment has been unplugged and that doors are closed and locked.  (Tr. 363).  Plaintiff reported having "tunnel vision" where he would see things in his peripheral vision that come and go very fast.  (Tr. 363).  Dr. Lamberty characterized the "tunnel vision" as sounding like hallucinations.  (Tr. 363).

Dr. Lamberty administered the MMPI-2, noting that the validity scale suggested significant symptom exaggeration.  (Tr. 364).  Dr. Lamberty opined that the test indicated severe psychiatric distress, but that due to Plaintiff's tendency to over-report his symptoms the true extent of his symptoms could not be ascertained.  (Tr. 365).  Dr. Lamberty opined that Plaintiff did not meet criterion A for PTSD because he had not experienced a threat of death or serious injury to himself.  (Tr. 365).  Dr. Lamberty assessed Plaintiff with anxiety disorder, not otherwise specified; ruled out obsessive-compulsive disorder and major depressive disorder.  (Tr. 366).  Dr. Lamberty assigned Plaintiff a GAF score of 50.  (Tr. 366).

On January 28, 2004, Plaintiff followed up with Dr. Wallerstein, reporting that exercises had helped his back and that he felt "'better' overall."  (Tr. 182).  Plaintiff indicated that he was hoping to pursue a pain clinic through the VA.  (Tr. 182).  Dr. Wallerstein prescribed physical therapy for Plaintiff to work on his hip girdle and lower extremity stretches and strengthening.  (Tr. 182).

On March 11, 2004, Plaintiff underwent a psychological evaluation related to his ongoing

problems with chronic pain.  (Tr. 154).  Plaintiff stated that he was barely able to get through a day

because of his problems with pain and that the pain was worse in the winter.  (Tr. 154).  Plaintiff

indicated that he was able to engage in more activities during summer, including gardening. (Tr. 154).

Plaintiff stated that his pain interfered completely with household chores, outside chores, recreation and

leisure activities, walking, sitting, sex, and any kind of sports.  (Tr. 154).  Plaintiff reported short-term

memory lapses.  (Tr. 154).  The Beck Depression Inventory was administered and Plaintiff scored

within the severe range for depression.  (Tr. 154).

That same day, a physical therapist observed that plaintiff was able to ambulate independently

with no limping or gait deviation.  (Tr. 150).  While standing, Plaintiff presented with a mild increase in

lumbar lordosis with a protruding abdomen.  (Tr. 150).  On March 17, 2004, Plaintiff told an

occupational therapist that he used long-handled tools as an adaptation to enable him to do outdoor

work.  (Tr. 152).  Plaintiff reported using heavy equipment, including to lift and move heavy items when

doing outdoor work.  (Tr. 152).

On May 17, 2004, Plaintiff was treated for chest pain.  (Tr. 367).  Plaintiff reported that he had

experienced chest pain since his 20's.  (Tr. 367-68).  On examination it was noted that Plaintiff was

talkative and nonchalant appearing.  (Tr. 368).  Plaintiff did not appear to be in acute distress and his

gait was normal.  (Tr. 368).  Cardiac testing was normal.  (Tr. 368).

On June 2, 2004, the Department of Veterans Affairs issued a rating decision, in which Plaintiff

was granted service connection for post traumatic stress disorder/depression with an evaluation of 70

percent, effective August 8, 2003.  (Tr. 60.)  The decision noted that the VA examiner opined that

Plaintiff's current psychiatric problems were a direct result of Plaintiff's experiences as a Naval

corpsman.  (Tr. 61).  The decision noted that "[a]n evaluation of 70 percent is assigned for

occupational and social impairment with deficiencies in most areas, such as work, school, family

relations, judgment, thinking, or mood[.]" (Tr. 61).  However, the decision explained that an evaluation

of 100 percent could not be assigned "because the medical evidence of record does not show there is

total occupational and social impairment . . . ."  (Tr. 62).  Plaintiff was granted entitlement to individual

unemployability because Plaintiff's VA examination showed that Plaintiff was "unable to secure or

follow a substantially gainful occupation as a result of [his] service-connected disabilities."  (Tr. 62).

Service connections for angina, back injury, bilateral foot condition, bilateral carpal tunnel, and bilateral

knee condition were denied.  (Tr. 60-61).  By letter, dated June 3, 2004, Plaintiff was granted

entitlement to the 100% rate because he was unable to work due to service connected disability.  (Tr.

57).

On July 14, 2004, Plaintiff was seen at Twin Ports VA regarding his low back pain.  (Tr. 316).

It was noted that he had been taking Ultram, but was taking too many so he was switched to Lortab.[14]

(Tr. 316).  On October 12, 2004, Plaintiff reported no change in his back discomfort.  (Tr. 313).  On

October 22, 2004, it was noted that Plaintiff had recently experienced "quite severe" chest pain.  (Tr.

310).

On January 13, 2005, Plaintiff was seen by Dr. Spencer, who continued his diagnosis of bipolar

disorder.  (Tr. 300).  Plaintiff reported some "suspicious times."  (Tr. 300).  Dr. Spencer discussed

using "atypical antipsychotics" which Plaintiff declined at the time.  (Tr. 300).

---

[14] Lortab is the brand name for hydrocodone.  PHYSICIAN'S DESK REFERENCE 3314; see also
supra n.4.

On March 17, 2005, Dr. Spencer completed another form assessment of Plaintiff's mental ability to do work-related activities.  (Tr. 353-54).  Dr. Spencer marked Plaintiff as fair in 14 out of 23 categories.  (Tr. 353-54).  Dr. Spencer opined that Plaintiff would be absent more than three times a month.  (Tr. 354).  Dr. Spencer concluded that Plaintiff "could not sustain competitive employment in my opinion."  (Tr. 354).

## IV.   TESTIMONY AT ADMINISTRATIVE HEARING

An administrative hearing took place before ALJ Nelson on April 21, 2005. (Tr. 379).  When asked what symptoms he had which kept him from working, Plaintiff testified that he has had back problems since 1996, when he was injured in a loading dock incident while working at a U.S. Air Force base.  (Tr. 383).  Plaintiff stated that he had been given 100 percent disability through the military.  (Tr. 386).  Plaintiff stated that his doctors did not tell him much, but that he could "feel the pain in [his] back a lot more than they actually believe [was] there."  (Tr. 388).  Plaintiff stated that due to the pain in his back,  it was difficult to bend over and put his boots on.  (Tr. 397).

Plaintiff stated that he had to pay to have his grass cut and snow shoveled.  (Tr. 394).  Plaintiff testified that he was physically able to bathe himself, but he only did so occasionally due to his debilitated physical condition.  (Tr. 394-95).  Plaintiff testified that he smokes occasionally and that he had stopped drinking.  (Tr. 395).  Plaintiff estimated that he could walk for 45 minutes before needing to stop, stand for 30-45 minutes, and sit for about an hour.  (Tr. 396-97).

Plaintiff testified that he was experiencing sleep deprivation, sometimes staying awake for three or four days at a time.  (Tr. 384-86).  Plaintiff stated that he had problems concentrating or holding thought processes for long periods of time, and that at times, it was like he would lose a "little portion of

15

time". (Tr. 384). Plaintiff explained that he would sometimes black-out while driving. (Tr. 384). When

reading "there'll be like a three line or a three sentence area that won't be there," stated Plaintiff. (Tr.

384). Plaintiff testified that he would get irritated and paranoid about whether he had completed routine

tasks such as turning off the stove or turning lights off. (Tr. 386). Plaintiff testified that he would

experience "mini-hallucinations." (Tr. 391). Plaintiff stated that he had experienced suicidal ideations,

and that he had tried to commit suicide by running his truck off of the road. (Tr. 398). However, when

questioned by the Medical Expert, Plaintiff stated that he crashed while driving drunk after his sister

died. (Tr. 402). Plaintiff stated that he never reported the accident, but that he did go to the hospital to

receive treatment for a cut on his forehead from the accident. (Tr. 398, 402-03).

**Medical Expert's Testimony**

Dr. Felling, the Medical Expert ("ME"), reviewed the record and questioned Plaintiff at the

administrative hearing. (Tr. 401-09). Dr. Felling noted that the records were "somewhat unclear" and

"not very specific to the difficulty [Plaintiff has] had." (Tr. 411). Dr. Felling stated that there was some

discrepancy between Plaintiff's testimony and the record. (Tr. 411). Dr. Felling analyzed Plaintiff's

condition under Listing 12.04,[15] testifying that Plaintiff experienced moderate restrictions in his activities

of daily living; moderate restrictions in social functioning; marked restrictions in concentration,

persistence, and pace; with no episodes of decompensation. (Tr. 412-14). Dr. Felling testified that

Plaintiff should be limited to relatively simple, probably repetitive, routine activities; work positions

which required significant daily changes in routine; brief superficial interactions with others; low stress

---

[15] 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.04.

16

with respect to pace and production; and positions which did not involve the use of math.  (Tr. 414-15).

### **Vocational Expert's Testimony**

The ALJ asked Mr. Villa, the Vocational Expert ("VE"), about a hypothetical individual with the following residual functional capacity ("RFC"):

> [A] 45-year old person with a high school education and work experience as a construction worker, who is impaired by lower back pain, depression NOS, he takes medications, his physical activity is limited to not lift or carry more than 20 pounds, he can stand and walk six out of an eight, and sit six, but he should have an opportunity to change positions at least . . . each half hour, and . . . there shouldn't be repetitive bending, stooping, crouching, and kneeling.  The work should be unskilled, simple repetitive work with minimum changes in routine, low stress, brief and superficial contact with fellow employees and the public.

(Tr. 417-18).  In response to the ALJ's question whether work was available, Mr. Villa testified that such an individual would be able to do nonproduction assembly, for which 1400-1600 jobs existed in Minnesota.  (Tr. 418).  Mr. Villa testified that permitted absenteeism would be twice per month.  (Tr. 418).

Plaintiff's representative asked Mr. Villa whether Dr. Spencer's evaluation characterizing Plaintiff's abilities as seriously limited, but not precluded in a number of areas would preclude any kind of competitive employment.  (Tr. 180-81, 419).  Mr. Villa responded that Dr. Spencer's evaluation would not preclude competitive employment because the positions considered involved unskilled work.  (Tr. 419).  Under further questioning, however, Mr. Villa stated that taken together, the abilities

marked "fair" by Dr. Spencer would be an impediment to competitive employment. (Tr. 419).

## V.    THE ALJ'S FINDINGS AND DECISION

On October 17, 2005, ALJ Nelson issued his decision denying Plaintiff's application for DIB. The ALJ followed the sequential five-step procedure as set out in the rules. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a). The Eighth Circuit has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity;" (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities;" (3) whether the claimant's impairment "meets of equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience);" (4) whether the claimant has the residual functional capacity [RFC][16] to perform his or her past relevant work;" and (5) if the ALJ finds that claimant is unable to perform the past relevant work then burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision. (Tr. 21). At step two, the ALJ found that Plaintiff's degenerative disc disease, disc herniation, spinal stenosis, post traumatic stress disorder, anxiety, bipolar disorder, depression, and a substance addiction disorder are considered "severe" based on the requirements in the regulations. (Tr. 21). At step three, the ALJ determined that Plaintiff's impairments do not meet or equal one of the listed presumptively disabling impairments. (Tr. 21).

---

[16] A claimant's RFC is the most the claimant can still do despite the claimant's physical and/or mental limitations. 20 C.F.R. §404.1545.

At step four, the ALJ determined Plaintiff's RFC:

he can lift and carry a maximum of ten pounds frequently and twenty pounds occasionally; he can sit for a maximum of six hours in an eight-hour day; he can stand for a maximum of six hours in an eight-hour day; stand for a maximum of six hours in an eight[-]hour day; he requires a sit/stand option that permits him to change position as frequently as every thirty minutes; he cannot perform repetitive bending, stooping or crouching; he is limited to performing simple, repetitive, unskilled work; he can tolerate no more than brief and superficial interactions with others.

(Tr. 21-22).

Based on the RFC and the testimony of the VE, the ALJ determined that plaintiff could not perform his past relevant work as a construction worker, roofer helper, and general maintenance worker. (Tr. 22). Thus, the ALJ turned to step five, at which he determined that Plaintiff could perform other jobs that existed in significant numbers such as assembly. (Tr. 21-22). Accordingly, ALJ Nelson found that Plaintiff was not disabled under the regulations imposed by the Social Security Act. (Tr. 22).

## V.      DISCUSSION

### **Standard of Review**

Review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); Haley v. Massanari, 258 F.3d 742, 747 (8th 2001). "The substantial evidence test employed in reviewing administrative

findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id. In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

**Analysis of the ALJ's Decision**

In this case, Plaintiff asserts that the ALJ found that Plaintiff had marked difficulties in concentration, persistence, or pace, but failed to include such limitations in the finding of residual functional capacity.  Plaintiff also asserts that the ALJ failed to accord the proper weight to the opinions of Dr. Spencer regarding Plaintiff's functional limitations.  In response, the Commissioner argues that substantial evidence supports the ALJ's RFC assessment, and that the ALJ properly included all of the limitations identified by Dr. Felling.  The Commissioner further argues that the ALJ's decision to decline to give Dr. Spencer's opinions controlling weight was reasonable in light of the relevant regulations and law.

The Court agrees with Plaintiff that the ALJ's RFC determination is not sustainable.  The Court finds, for reasons discussed below, that the ALJ failed to accord proper weight to Plaintiff's treating physician, Dr. Spencer.  Accordingly, the Court also finds that Plaintiff is subject to a disability and that he is entitled to an award of benefits.

### The ALJ's Evaluation of the Medical Evidence

The opinion of a treating physician must be afforded substantial weight.  Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998).  Nevertheless, an opinion rendered by a claimant's treating physician is not necessarily conclusive.  Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1995).  An ALJ may discount a treating physician's medical opinion when the treating source's statements are conclusory or unsupported by medically acceptable clinical or diagnostic data.  Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

When weighing a medical opinion, the ALJ should consider: 1) the examining relationship; 2) the treatment relationship; 3) whether medical findings support the opinion; 4) whether the opinion is consistent with the record as a whole; and 5) whether the physician is a specialist.  20 C.F.R. §§ 404.1527(d)(1)-(5), 416.927(d)(1)-(5); Brueggemann v. Barnhart, 348 F.3d 689, 694 (8th Cir. 2003).  It is not, however, the law in the Eighth Circuit that the ALJ must consider each factor in deciding how much weight to accord a medical opinion, but rather the ALJ "should 'give good reasons' for discounting a treating physician's opinion." Dolph v. Barnhart, 308 F.3d 876, 878-79 (8th Cir. 2003) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000), reh'g and reh'g en banc denied, April 26, 2000); cf. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).

In this case, the ALJ recognized that Plaintiff was severely impaired by, inter alia, post traumatic stress disorder, anxiety, bipolar disorder, and depression.  (Tr. 21.)  Having made that threshold determination, the ALJ was tasked with determining the extent to which those impairments actually limited Plaintiff's RFC and his ability to work.  At the core of that determination is the treatment history and RFC opinions of Dr. Spencer.  Dr. Spencer's opinion goes to the heart of Plaintiff's claim.  The VE acknowledged that if Plaintiff exhibited absenteeism at a rate of three days per month, he would be precluded from competitive employment.  (Tr. 418).  The VE further testified that Dr. Spencer's evaluation of Plaintiff's abilities, taken together, would be an impediment to competitive employment.  (Tr. 419).  If Dr. Spencer's opinion were accorded controlling weight, it is clear from the testimony of the VE that Plaintiff would be precluded from competitive employment, and would be

disabled under the regulations imposed by the Social Security Act.  See 20 C.F.R. §§ 404.1520(g), 416.920(g).

The ALJ rejected Dr. Spencer's opinion that Plaintiff would be unable to maintain competitive employment, and specifically that he would be absent from work more than three times per month, despite Dr. Spencer's treatment relationship with Plaintiff.  (Tr. 19, 181).  The ALJ rejected Dr. Spencer's opinion as lacking "objective findings" and because the "record does not contain objective findings to support the conclusion that the claimant cannot maintain competitive employment."  (Tr. 19).

Contrary to the ALJ's characterization, the weight of the evidence in the record does support Dr. Spencer's opinions.  Gavin, 811 F.2d at 1199.  Dr. Desmonde, a consultative examiner with the state disability agency, assessed Plaintiff with a GAF score of 45-50 and opined that Plaintiff would not be able to tolerate the stress and pressure of full-time, competitive employment.  (Tr. 179).  Dr. Lamberty, a consultative examiner for the VA, administered the MMPI-2, noting that while the validity scale suggested symptom exaggeration, the test indicated that Plaintiff was in severe psychiatric distress.  (Tr. 364).  In March of 2004, Plaintiff scored within the "severe" range for depression on the Beck Depression Inventory.  (Tr. 154).  In June of 2004, the VA granted Plaintiff entitlement to benefits because he was unable to work due to his service connected disability.  (Tr. 57).  It can also be inferred from Dr. Spencer's note dated January 13, 2005, that Plaintiff was not improving in that Dr. Spencer was considering "atypical antipsychotics."  (Tr. 300).

Notably, the ALJ's discussion omits any discussion of Dr. Lamberty's examination.  The ALJ rejected Dr. Desmonde's opinion, because "Dr. Desmonde has indicated that his opinion is based in

part on the claimant's pain level . . . [and] assessing the claimant's physical impairments and related

limitations is beyond Dr. Desmonde's area of expertise." (Tr. 18). Instead, the ALJ relied on the

testimony of Dr. Felling in formulating his opinion as to Plaintiff's RFC, and he accorded weight to the

opinion of a State Agency physician. (Tr. 18, 19). However, neither Dr. Felling or the State Agency

physician had examined the Plaintiff, let alone had a treating relationship with Plaintiff. See 20 C.F.R.

§§ 404.1527(f), 416.927(f). It is a simple fact that both Dr. Lamberty and Dr. Desmonde examined

Plaintiff, and that Dr. Spencer had a lengthy and significant treating relationship with Plaintiff. Id., §§

404.1527(d)(2)(i)-(ii), 416.927(d)(2)(i)-(ii) (more weight is generally given the longer and more in

depth a treatment relationship). Dr. Lamberty, Dr. Desmonde, and Dr. Spencer are all mental health

specialists. Id., §§ 404.1527(d)(5), 416.927(d)(5) (more weight is generally given to the opinion of a

specialist). And, as discussed above, Dr. Spencer's opinion was consistent with the record, specifically

with the findings of Dr. Desmonde and Dr. Lamberty. Id., §§ 404.1527(d)(4), 416.927(d)(4).

Furthermore, the ALJ failed to consider the fact that the VA determined that Plaintiff was

unable to work due to service connected disability. (Tr. 57). While a VA disability determination is

not binding on an ALJ considering a Social Security disability claim, it is "important enough to deserve

explicit attention." Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). Where the VA has made a

disability determination, the ALJ must consider that determination in making a decision. Id. (citing

Wilkins v. Callahan, 127 F.3d 1260, 1262 (10th Cir. 1997); Baca v. Dep't of Health and Human

Services, 5 F.3d 476, 480 (10th Cir. 1993); Fowler v. Califano, 596 F.2d 600, 603 (3d Cir. 1979)).

While the ALJ's failure to address the VA's determination with respect to Plaintiff is not conclusive in

and of itself, it is further indication that the ALJ ignored evidence in the record which supported the

opinion of Dr. Spencer.

The ALJ in this matter was tasked with weighing the evidence and adequately explaining the reasoning behind his determinations.  Dolph, 308 F.3d at 878-79; Culbertson, 30 F.3d at 939. Following a thorough review of this matter, this Court finds that the ALJ failed to accord proper weight to the medical opinions of Plaintiff's treating and evaluating medical sources.  Burress, 141 F.3d at 880. Accordingly, the ALJ's determination that Plaintiff does not meet the statutory criteria for a finding of disability is not supported by substantial evidence on the record as a whole.  42 U.S.C. §405(g); Morse, 32 F.3d at 1229.  The Court finds that the ALJ failed to accord proper weight to the opinion of Dr. Spencer, and that when proper weight is accorded, the Plaintiff is disabled under the regulations imposed by the Social Security Act.  See 20 C.F.R. §§ 404.1520(g), 416.920(g).  Because the evidence of record clearly establishes that Plaintiff is under a disability, a remand in this case would only delay the receipt of benefits to which Plaintiff is clearly entitled.  Hutsell, 259 F.3d at 714.  Accordingly, it is recommended that the decision of the Commissioner be reversed and that judgment be entered awarding Plaintiff disability benefits.

## VI.     RECOMMENDATION

For the foregoing reasons, this Court recommends that:

1)      Plaintiff's Motion for Summary Judgment [Docket No. 6], be **GRANTED**;

2)      The Commissioner's Motion for Summary Judgment [Docket No. 10], be **DENIED**; and

3)      The decision of the Commissioner be reversed and that judgment be entered awarding Plaintiff disability benefits.

25

Dated:    June 25, 2007

                                                       s/ Arthur J. Boylan
                                                    Arthur J. Boylan
                                                    United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before July 12, 2007.